IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CHRISTOPHER DAVID DOUGLAS,

Defendant.

Case No. CR11-3044

REPORT AND RECOMMENDATION

TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.   Defendant's Arrest. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.   Defendant's Prior Drinking. . . . . . . . . . . . . . . . . . . . . . . . 7
     C.   Defendant's Education. . . . . . . . . . . . . . . . . . . . . . . . . . 8
     D.   Experts' Evaluations. . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          1.   J.W. Baker, III. . . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.   Dr. Jeremiah Dwyer. . . . . . . . . . . . . . . . . . . . . . . . . 9

V.   DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     A.   Waiver of Miranda Rights. . . . . . . . . . . . . . . . . . . . . . . . . 12
          1.   Knowing and Intelligent. . . . . . . . . . . . . . . . . . . . . . 13
          2.   Voluntary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     B.   Voluntary Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.  SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VII. RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# I. INTRODUCTION

On the 9th day of November 2011, this matter came on for hearing on the Motion to Suppress Statements (docket number 19) filed by the Defendant on November 1, 2011, as amended (docket number 24) on November 3, 2011. The Government was represented by Assistant United States Attorney John H. Lammers. The Defendant appeared in court and was represented by his attorney, Mark C. Meyer.

At Defendant's request, the Court kept the record open to permit further evidence on the issue of whether Defendant lacked the mental capacity to understand the *Miranda* warning and voluntarily waive his *Miranda* rights. Following evaluations by the parties' respective experts, the matter came on for further hearing on March 1, 2012. Again, the Government was represented by Mr. Lammers, with Defendant appearing personally, together with Mr. Meyer.

# II. PROCEDURAL HISTORY

On September 29, 2011, Defendant was charged by Indictment with conspiracy to distribute methamphetamine (Count 1), and possession with intent to distribute methamphetamine (Count 2). Defendant entered a plea of not guilty, and trial was scheduled for November 28, 2011. After Defendant's initial attorney was permitted to withdraw, Defendant's unresisted motion for a continuance of the trial was granted, and the trial was rescheduled for January 3, 2012.

On November 1, 2011, Defendant timely filed a motion to suppress. The motion was amended on November 3, 2011. On November 7, 2011, the Government timely filed its Resistance (docket number 26) to the motion. On November 8, 2011, Defendant filed a "Supplement" to his motion to suppress (docket number 27), requesting that the record be kept open to allow introduction of evidence following a psychological evaluation to determine Defendant's cognitive abilities. The motion was granted.

On December 5, 2011, Defendant filed under seal a psychological report (docket number 40) prepared by J.W. Baker, III. At the status hearing on December 7, 2011, the

Government asked that it be permitted to have Defendant evaluated by an expert for purposes of rebuttal. In addition, the Government asked that Defendant be ordered to undergo a competency evaluation. Defendant did not object. By separate Order (docket number 42), the Court committed Defendant to the custody of the attorney general for a competency evaluation. Due to the competency evaluation, the trial was continued to March 12, 2012.

Defendant was transported to the Federal Detention Center in Englewood, Colorado, ("FDC-Englewood") for the evaluation. Defendant arrived at FDC-Englewood on December 21, 2011, and completed his evaluation on or about February 6, 2012. Defendant was returned to the Northern District of Iowa on February 27, 2012. The continued hearing on the motion to suppress was then held on March 1, 2012.

As a consequence of Defendant's competency evaluation and the transportation associated with his commitment at FDC-Englewood, it was necessary to continue the trial. Trial is now scheduled for April 23, 2012, with a status hearing scheduled on March 28, 2012. *See* docket number 50.

### III. ISSUES PRESENTED

Defendant asks the Court to suppress statements made by him to law enforcement officers on September 23, 2011. Defendant asserts that he did not knowingly and voluntarily waive his *Miranda* rights, and that his subsequent statements to officers were not made voluntarily.

### IV. RELEVANT FACTS

#### A. Defendant's Arrest

Deputy Sheriff Matt Klunder, who is currently assigned to the North Central Iowa Narcotics Task Force, testified regarding the events of September 23, 2011. According to Klunder, authorities had known "for several years" about Defendant's involvement in trafficking methamphetamine. At approximately 1:30 p.m. on September 23, 2011, authorities arranged a controlled delivery of approximately one pound of methamphetamine

to Defendant's residence. A confidential informant delivered the drugs to Defendant and was paid approximately $1,500.

Anticipating the controlled transaction, Deputy Klunder prepared an application for a search warrant to search Defendant's residence. Klunder stood by in the office of a judicial magistrate while the controlled delivery took place. After Klunder was advised by surveillance officers that the transaction was completed, Klunder finished the search warrant application and submitted it to the judicial magistrate. A search warrant was issued and Klunder then contacted officers at the scene to advise them a search had been authorized.

Deputy Klunder arrived at Defendant's residence approximately five minutes after the officers gained entry and, therefore, was unable to provide details regarding the entry. According to Klunder, however, there were approximately six officers present at that time and it is standard procedure to have weapons drawn under those circumstances. Klunder recalled being told that Defendant was in the kitchen when they entered.

When Deputy Klunder arrived on the scene, Defendant was sitting on the floor in the kitchen, with his hands handcuffed behind his back. Defendant was wearing "basketball shorts," with no shirt. Prior to questioning, Defendant's handcuffs were moved to the front, to enable Defendant to sign a "DNA swab sheet or something like that," and "also just for comfort."

Deputy Klunder testified that he observed Deputy Frank Hodak read a *Miranda* warning to Defendant from a card. Officers did not ask Defendant to sign a written waiver of his *Miranda* rights, and Klunder testified that it is not "standard procedure" to seek a written waiver. After Defendant was *Mirandized*, Klunder questioned him while he was still sitting on the floor in the kitchen. Klunder's questioning of Defendant was digitally recorded, with the recording introduced at the instant hearing as Exhibit 1 and a transcript introduced as Exhibit 1A. Also present during the questioning was Special Agent Chris Hague of the Drug Enforcement Administration ("DEA").

The recording extends for approximately 24 minutes.[1] Initially, the recording consists of background noise and unrelated activity. At approximately four minutes into the recording, Deputy Klunder began the interrogation as follows:

> Chris obviously you are in a predicament today. You ah, I guess today is going to be about your only opportunity to try and help yourself out, at least minimize the damage. It is completely up to you if you want to talk to us like Deputy Hodak read you your miranda earlier, but seems ah you obviously know what happened today and you have a lot (unintelligible) about you in the last four years. You are looking at a significant amount of time, it is kind of up to you what you want to do with it. We are more than willing to talk to you and try to figure something out or if you don't want to talk you are going to go to jail, you will probably go either way, but kind of how you want to play it.

Transcript of Christopher Douglas Interview (Exhibit 1A) at 1.

When Defendant did not immediately respond to Deputy Klunder, Special Agent Hague asked some biographical questions regarding his place of birth, whether he had gone by any other names, his dad's name, address, and age, his mother's name and age, his girlfriend's name, age, and address, whether or not he had any children, his phone number, and his employment. Defendant answered responsively to each of those questions.

Approximately eight and one-half minutes into the recording, Deputy Klunder told Defendant that "we want to talk to you but your window is going to be kind of a short one, or a small one on what you want to do."[2] Klunder told Defendant that "you could be

---

[1] Statements made by Defendant, if any, during the five minutes between the officers' entry into the residence and Deputy Klunder's arrival were not recorded. In addition, Klunder testified that there was a short period of time when Special Agent Hague asked Defendant questions while Klunder retrieved the digital recorder from his car. Apparently, however, the Government does not claim that Defendant made any incriminating statements before the recorder was activated.

[2] Transcript of Christopher Douglas Interview (Exhibit 1A) at 3.

looking at a federal case." [3] Defendant was advised that even without a prior felony drug conviction, "you'd be looking at a minimum of 10 years maybe up a little higher than that depending on the weights and the sentencing guideline."[4]

Upon further questioning by Deputy Klunder and Special Agent Hague, Defendant made incriminating statements regarding the purchase and sale of methamphetamine. At approximately the 14-minute mark of the recording, after being asked how much he would pay for "dope" obtained from Mexico, Defendant responded: "Uh, I couldn't say (unintelligible) I am really dazed right now."[5] Klunder opined at the first hearing that Defendant meant he was "shocked by the situation" he was in. At the 19-minute mark of the recording, after providing officers with additional information regarding the sale of drugs, Defendant was asked for the names of his customers. Defendant responded: "I can't think right now I am drawing just a fucking brain fart. I am sorry I'm not I am lost right now."[6] The questioning ended a few minutes later, and Defendant was transported to the police station.

Deputy Klunder testified that he was familiar with Defendant and had talked to him on several prior occasions. According to Klunder, he had previously arrested Defendant for failing to appear and on two other occasions for driving while barred. When asked whether he had given Defendant a *Miranda* warning on those prior occasions, Klunder responded: "Not that I recall." Klunder also listened to more than 20 "jail calls" made by Defendant, and observed Defendant testify in an earlier forfeiture proceeding. Klunder testified that Defendant's voice and demeanor on those prior occasions were consistent with his voice and demeanor during the interrogation on September 23, 2011. Klunder testified that he did not smell alcohol on Defendant, despite being "literally face-to-face

---

[3] *Id.* at 4.

[4] *Id.*

[5] *Id.* at 6.

[6] *Id.* at 9.

with him a few times." Defendant did not tell officers that he had been drinking, nor did he say that he did not understand any of the questions. According to Klunder, Defendant answered "appropriately" to the questions and did not slur his words. The Court has listened to the recording, and Defendant's answers appear responsive, with no obvious indication of impairment.

A few days later, Deputy Klunder attempted to question Defendant further while he was in jail. Defendant invoked his right to remain silent and did not answer any questions.

### B. Defendant's Prior Drinking

Defendant's mother, Linda Douglas, testified that Defendant came to her house at approximately 3:30 a.m. that same day. According to Ms. Douglas, Defendant would do this on a regular basis. She would "go to the window and talk to him and sometimes let him in the house." Ms. Douglas testified that she knew as soon as she saw him that he was drunk. When he got closer, she could also smell alcohol. According to Ms. Douglas, Defendant definitely had a "drinking problem," and had always been drinking when he appeared at her house during the early morning hours. Defendant left his parents' home at approximately 4:00 a.m.

Jan Kidwell, an investigator retained by Defendant, testified regarding Defendant's drinking habits. Amanda Maclinburg, Defendant's girlfriend, told Kidwell that Defendant's "major problem" was drinking. Ryan Kramer, a bartender at Sally's in Mason City, told Kidwell that Defendant had been in the bar on the evening prior to his arrest. Kramer recalled immediately that Defendant had a $55.50 tab. Defendant left Sally's at around midnight and, according to Kramer, "was very intoxicated."

Mr. Kidwell also interviewed a manager and bartender at Homer's, another drinking establishment in Mason City. According to Kidwell, he was told that Defendant's "regular regiment would be to stop off at Homer's before he went home." The persons interviewed were unable to confirm, however, whether Defendant was at Homer's on the night preceding his arrest.

## C. Defendant's Education

Linda Douglas also testified regarding Defendant's schooling. Defendant was in "special education" classes until he reached high school, when he was assisted by a tutor. Defendant graduated from the Mason City High School in 1998. According to his transcript (Defendant's Exhibit A), Defendant earned mostly Cs and Ds. His cumulative GPA was 1.592, which placed him 262nd in a graduating class of 269. Ms. Douglas attempted to obtain Defendant's records from the Northern Trails Area Education Association, but was advised that the records are destroyed after three years.

## D. Experts' Evaluations

### 1. J.W. Baker, III

At Mr. Meyers' request, Defendant was interviewed in jail by J.W. Baker, III, a licensed psychologist in private practice in Cedar Rapids. Defendant was interviewed by Baker and a number of psychological tests were administered. While Mr. Baker did not testify, his report was received at the second hearing as Exhibit B. Baker described Defendant as "very prone to distraction," with his thought processes "not very well organized."

> Affect and mood were appropriate to the context of the meeting and he was cooperative. He was fairly oriented. As the meeting progressed he was found to be restless and very prone to distraction. His internal thought processes are not very well organized. He is a stream of consciousness thinker (and talker) and needs to be consistently redirected. He blurts out answers to questions before the questions have been completed and he has very little ability to restrain himself from talking about anything. Questions have to be repeated continually because he does not seem to be listening well or he cannot sustain attention for any more than a few seconds. Any kind of distraction sets him off, and this is when he is sober or not feeling threatened.

Report of J.W. Baker, III (docket number 40) at 2.

According to Mr. Baker, Defendant scored a full scale IQ of 69 (2nd percentile). In the Verbal Comprehension Index subtest, Defendant scored at the 5th percentile. According to Baker, Defendant also suffers from ADHD. Defendant has also suffered various head injuries and, according to Baker, "is a walking clinical case of "Mild Traumatic Brain Injury."[7]

According to his report, the *Miranda* warning read to Defendant was submitted by Mr. Baker to analysis using the *Flesch-Kincaid* readability tests found at Editcentral.com. Baker asserts that the *Miranda* warning tests at a 6.3 grade level, while Defendant is only able to comprehend at a 3.0 grade level.

### 2. *Dr. Jeremiah Dwyer*

As set forth above, Defendant was subsequently evaluated at the Federal Detention Center in Englewood, Colorado. Defendant was observed for approximately 45 days. A report by Jeremiah Dwyer, Ph.D., a forensic psychologist employed by the Bureau of Prisons, was filed as docket number 52. Dr. Dwyer evaluated Defendant both for his competency to stand trial and also for his capacity to understand and waive his *Miranda* rights.[8]

The evaluation of Defendant at FDC-Englewood included clinical interviews, observation of Defendant's behavior at the facility, legally focused interviews, and the administration of several tests. Dr. Dwyer also reviewed various legal documents provided by both the prosecution and the defense.

Dr. Dwyer did not observe the hyperactivity or excessive speech described by Mr. Baker.

> Mr. Douglas did present with mild attentional deficits during the course of the evaluation, depending on the topic or task being discuss[ed]; there was no evidence of hyperactivity, and

---

[7] Report of J.W. Baker, III (docket number 40) at 6.

[8] It should be noted that neither party is asserting that Defendant is not competent to stand trial. Accordingly, the Court will not address specifically those portions of Dr. Dwyer's report.

> his speech was typically reserved rather than excessive;
> prompts to elaborate or provide additional information were
> frequently necessary.

Report of Jeremiah Dwyer, Ph.D. (docket number 52) at 11.

In his report, Dr. Dwyer discusses at some length the testing conducted to determine Defendant's intellectual functioning. In addition to a standard "IQ test," Dwyer also administered additional reading and comprehension tests.[9] When Defendant was given the Wide Range Achievement Test - Fourth Revision (WRAT-4), he scored at the 8.1 grade level for sentence comprehension. According to Dwyer, this "measures an individual's ability to gain meaning from words, and to comprehend information contained in sentences."[10]

After discussing Defendant's mental status in detail, Dr. Dwyer then turns to the issue of whether Defendant had the capacity to understand and waive his *Miranda* rights. In this regard, Defendant was administered all four sections of the Miranda Rights Comprehension Instruments (MRCI), "a set of four instruments designed to assist in the determination of a defendant's capacities to understand and appreciate the significance of their Miranda rights."[11] In considering the test results, however, Dwyer cautions that Defendant may have acquired some additional understanding of his *Miranda* rights since the time of his arrest, and that the version used with Defendant "currently only has official normative data for juvenile defendants; no adult norms are as yet available."[12] After noting these "cautions," Dwyer states that Defendant "did not demonstrate any significant

---

[9] Dr. Dwyer notes that he used the WAIS-IV, while Mr. Baker administered the WAIS-III, an older version of the IQ test.

[10] Report of Jeremiah Dwyer, Ph.D. (docket number 52) at 15.

[11] *Id.* at 21.

[12] *Id.* at 22.

areas of concern with respect to his performance on the MRCI."[13] On the first subtest, measuring a defendant's understanding of the elements of the *Miranda* rights, Defendant scored 10 out of 10. On the second subtest, measuring whether "various interpretations of each element are similar or different from the actual element," Defendant answered 15 out of 15 correctly.[14] The third subtest, which is a structured interview with visual stimuli, is designed to assess a defendant's understanding of the basic elements associated with an interrogation. Defendant scored 26 out of 30. The last subtest measures a defendant's understanding of the vocabulary associated with *Miranda* rights. Defendant scored 31 out of 32.[15]

In assessing Defendant's ability to understand the *Miranda* warning, Dr. Dwyer also noted that it is not based on reading ability alone. That is, since *Miranda* warnings are given verbally, "it is important to assess what an individual is able to verbally grasp, not just what they can read."[16] According to Dwyer, the tests administered on Defendant indicated his "receptive vocabulary" fell within the average range, his "expressive vocabulary" fell within the low average range, and he had an ability to comprehend written material at an eighth grade level.[17] According to Dwyer, "Miranda rights tend to fall between the 6th-7th grade level in terms of reading."[18] Dwyer concluded that Defendant "has the general capacity to understand and appreciate his Miranda rights."[19]

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 23.

[17] *Id.*

[18] *Id.*

[19] *Id.*

Dr. Dwyer notes, however, that in determining whether Defendant understood his rights on September 23, 2011 requires an assessment regarding whether he was impaired at that particular time. After reviewing the facts associated with the search and related interrogation, Dwyer opines that there is evidence to suggest Defendant "had the capacity to understand and waive his Miranda rights at the time of his arrest."[20]

## V. DISCUSSION

In his initial motion to suppress, Defendant claimed that statements made by him in response to police questioning at his home were "involuntary." According to Defendant, he was "under the influence of alcohol" and the police suggested to Defendant that he "stood to benefit by answering their questions." Defendant argued that "[t]he combination of these factors, including Douglas' diminished capacity and the police inducements, caused his will to be overborne and made his decision to make statements involuntary."[21]

In his subsequent amendment to the motion to suppress, Defendant references his claim that his statements to police were involuntary. The amendment further states, however, that counsel had "just learned that Defendant had been in special education classes while in school," and had limited reading comprehension. Defendant argues that this fact is not only relevant to the question of whether his statements were voluntary, it also "gives rise to an argument" that he did not knowingly and voluntarily waive his Miranda rights.[22]

### A. Waiver of Miranda Rights

The Court will first address whether Defendant knowingly, voluntarily, and intelligently waived his Miranda rights. It is undisputed that Defendant was read a Miranda warning prior to questioning. It is also undisputed that Defendant impliedly

---

[20] *Id.* at 25.

[21] *See* Motion to Suppress Statements (docket number 19) at 1.

[22] *See* Amendment to Motion to Suppress Statements (docket number 24) at 1.

waived his *Miranda* rights by responding to the officers' questions. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (recognizing an implied waiver of *Miranda* rights). The issue here is whether Defendant's waiver was "knowing, voluntary, and intelligent." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005). "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). That is, the inquiry regarding whether a suspect has waived his *Miranda* rights has "two distinct dimensions":

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (quoting *Moran*, 475 U.S. at 421). In determining whether a suspect's waiver is valid, the Court must consider the totality of the circumstances. *Id.*

### 1. Knowing and Intelligent

The Court will first determine whether Defendant's waiver was "knowing and intelligent." Defendant argues that his limited intelligence, coupled with his intoxication, prevented him from knowingly and intelligently waiving his *Miranda* rights. The Government argues that Defendant was not intoxicated at the time of questioning, understood his rights, and knowingly and intelligently waived those rights.

Turning first to the issue of intoxication, Defendant argues that he was intoxicated when he waived his *Miranda* rights and responded to questioning. To bolster his claim, Defendant presented testimony from Linda Douglas indicating that he was intoxicated at 3:30 a.m. on the morning of the arrest. Jan Kidwell, an investigator retained by

Defendant, provided hearsay testimony that Defendant left a bar "very intoxicated" around midnight on the evening prior to his arrest. Officers did not enter Defendant's home until 1:30 p.m., however, a full 10 hours after he left his mother's home and more than 13 hours after his last known drink. It would appear that his early morning intoxication had worn off. Deputy Klunder stated that he did not smell alcohol on Defendant during the interrogation, despite being "literally face-to-face with him a few times." According to Klunder, Defendant did not slur his words or appear intoxicated. Furthermore, from a review of the recording, Defendant's answers appear responsive and there is no indication of impairment.

There is no evidence to suggest that Defendant's use of alcohol at least ten hours earlier impacted his "awareness" of the *Miranda* rights read to him when the search was executed. Defendant did not smell of alcohol, slur his words, or otherwise appear intoxicated. The Court concludes that Defendant's prior use of alcohol had no apparent effect on the "knowing and intelligent" waiver of his *Miranda* rights.

Turning to Defendant's intellectual capacity, Defendant's mother testified that Defendant was in "special education" classes until he reached high school and needed the assistance of a tutor to graduate high school. While in high school, Defendant earned mostly Cs and Ds and finished with a cumulative GPA of 1.592, which placed him 262nd in a graduating class of 269.

J.W. Baker, III, a local psychologist in private practice, found that Defendant has an IQ in the 2nd percentile and scored at the 5th percentile in the verbal comprehension subtest. While the *Miranda* warning is written at a 6th grade level, Baker opined that Defendant is only able to comprehend at a 3rd grade level.

Defendant was subsequently subjected to a more thorough evaluation by Dr. Jeremiah Dwyer, a forensic psychologist at FDC-Englewood. According to Dwyer, Defendant scored at the 8th grade level when given a "sentence comprehension" test. In addition, Defendant was given a series of tests designed specifically to determine his

understanding of the *Miranda* rights. Based on Defendant's test results and the interviews conducted, Dwyer concluded that Defendant "has the general capacity to understand and appreciate his Miranda rights."

The record also suggests that Defendant had some prior knowledge and understanding of his legal rights. In considering the totality of the circumstances, the Court may consider Defendant's prior interactions with law enforcement. *Vinton*, 631 F.3d at 483 (finding that the district court properly considered the defendant's prior interactions with law enforcement to support its finding that the defendant's *Miranda* waiver was voluntary, knowing, and intelligent). Defendant had apparently been arrested on 14 prior occasions and, therefore, had experience with the criminal justice system. The record is silent, however, regarding whether Defendant was advised at those times of his right to remain silent and his right to counsel. Defendant is also aware of other legal rights, and knows how to advocate for those rights, as evidenced by his testimony in an earlier forfeiture proceeding.

In support of its argument that Defendant understood his right to remain silent and how to invoke this right, the Government points to the fact that Defendant invoked his right to remain silent and right to counsel when Deputy Klunder attempted to question him in jail a few days after his arrest.[23] The Court gives little weight to this evidence, however, because the circumstances of Klunder's attempted interrogation three days later were much different than those of the initial interrogation. Moreover, the record does not

---

[23] In *United States v. Makes Room For Them*, 49 F.3d 410, 413 (8th Cir. 1995), the defendant signed a *Miranda* waiver form and then made incriminating statements during an interrogation. The next day, officers asked the defendant to identify the murder weapon, but the defendant invoked his *Miranda* right to have counsel present. *Id.* Defendant sought to suppress the statements, arguing he lacked the intelligence necessary to voluntarily waive his rights. *Id.* at 415. The court concluded that the defendant "was clearly intelligent enough to understand his rights and to know how to invoke them. Indeed, he invoked these rights the next day." *Id.*

show whether Defendant received further information or advice regarding his rights between the initial interrogation and Klunder's attempted interrogation three days later.[24]

In *United States v. Turner*, 157 F.3d 552 (8th Cir. 1998), the defendant was arrested following a traffic stop when the officer concluded that he "was impaired by something other than alcohol." After being transported to the jail, the defendant was advised of his *Miranda* rights, and waived those rights. Following the interview, while still in jail, the defendant exhibited "bizarre" behavior. *Id.* at 554. It was determined that the defendant's I.Q. "was in the low-average to borderline range," and that he was under the influence of phencyclidine (PCP). The defendant argued that he "did not have the mental capacity to voluntarily and knowingly waive his rights." *Id.* The Court rejected the defendant's argument, concluding that "although Turner's I.Q. was in the low-average to borderline range, he was 'clearly intelligent enough to understand his rights.'" *Id.* at 555 (quoting *United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir. 1995)).[25]

After considering the totality of the circumstances, I believe that Defendant's waiver of his *Miranda* rights was "knowing and intelligent." Neither Defendant's prior use of alcohol, nor his limited intelligence, prevented Defendant from being fully aware of his rights and the consequences of waiving those rights. Defendant is 32 years old, and was living independently, working, and managing his own affairs at the time of this incident. Defendant had numerous prior interactions with law enforcement. While he has below average intelligence, Defendant is able to understand his right to counsel and right to remain silent, and able to understand the consequences flowing from giving up those rights. Defendant's prior use of alcohol and limited intelligence did not prevent him from knowingly and intelligently waiving his *Miranda* rights.

---

[24] While the record is imprecise, it is likely that Defendant had met with an attorney by that time.

[25] In *Makes Room*, the defendant argued that his waiver of *Miranda* rights and his subsequent confession were involuntary "because he is of average or lower than average intelligence with only an eighth grade education, and is therefore peculiarly susceptible to having his will overborne." 49 F.3d at 415.

## 2. *Voluntary*

The Court next considers whether Defendant's *Miranda* waiver was voluntary. Defendant argues that the waiver of his *Miranda* rights was not voluntary because the "police inducements" caused his will to be overborne. The Government rejects Defendant's claims, and argues that there is no evidence that Defendant's waiver was the product of "intimidation, coercion, or deception."

A waiver is "'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Thai*, 412 F.3d at 977. Stated otherwise, the test for voluntariness is "whether the defendant's will was overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). In his brief, Defendant concedes that "there was no physical coercion" by police, but argues that "his will was overborne" by the surrounding circumstances, including Deputy Klunder's suggestion that "he would benefit from making statements to him when in fact he would have been well-advised to remain silent."[26] The Government denies that Klunder made any threats or promises, and asserts that there is no evidence to suggest that Defendant's "will was overborne" by the brief questioning at his residence.

Defendant argues that his intoxication and limited intellectual ability support a finding that his will was overborne in responding to Deputy Klunder's questions. As set forth above, however, the Court concludes that there is no substantial evidence to support a conclusion that Defendant was intoxicated when questioned by Klunder. While Defendant may have been intoxicated ten hours earlier at his mother's residence, Klunder testified that Defendant did not smell of alcohol or exhibit signs of intoxication when being questioned. A review of the audio tape supports Klunder's testimony in that regard. The Court has not disregarded the fact that when asked how much he was paying for "dope" obtained from Mexico, Defendant responded "uh, I couldn't say (unintelligible) I'm really

---

[26] Defendant's Brief (docket number 19-1) at 2.

dazed right now." Similarly, when Defendant was asked to identify his drug customers, he told officers that he was unable to do so and "I am lost right now." The Court does not believe, however, that the responses support a finding that Defendant was intoxicated, or that any alleged intoxication caused his will to be overborne. *See United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008) (to render a statement involuntary, a defendant's intoxication must cause his will to be overborne).

Defendant also suggests that his will could be more easily overborne because of his intellectual limitations. As described in more detail above, Defendant is 32 years old and has had substantial prior dealings with law enforcement. Nothing on the audio tape or the testimony regarding the events of that afternoon suggest that Defendant was intimidated by the officers while being questioned in the kitchen of his home.

Finally, Defendant claims that the "police inducements" caused his will to be overborne. At the beginning of the questioning, Deputy Klunder told Defendant that "today is going to be about your only opportunity to try and help yourself out." Klunder stated that "[y]ou are looking at a significant amount of time, it is kind of up to you what you want to do with it." Defendant was also advised by Klunder, however, that "[i]t is completely up to you if you want to talk to us." Defendant was also told that whether or not he was willing to talk, "you will probably go [to jail] either way." The Court concludes that Klunder did not make any threats, nor did he make any promises. Nothing in Klunder's comments would have caused an experienced law-breaker, such as Defendant, to have his "will overborne." The Court concludes that Defendant was not intimidated or coerced while being questioned at his home on September 23, 2011, nor were police guilty of any deception. After considering the totality of the circumstances, the Court concludes that Defendant's waiver of his *Miranda* rights was voluntary.

### B. Voluntary Statements

Next, Defendant argues that his statements in response to questioning by Deputy Klunder and Special Agent Hague were not voluntary. This analysis follows closely the

discussion set forth above regarding the voluntariness of Defendant's waiver of his *Miranda* rights.

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004). However, "[t]he mere fact that an officer may have elicited a confession 'through a variety of tactics, including claiming not to believe a suspect's explanation, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices,' does not render a confession involuntary unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" *United States v. Boslau*, 632 F.3d 422, 428-29 (8th Cir. 2011) (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005)). "Whether a confession is involuntary is judged by the totality of the circumstances." *LeBrun*, 363 F.3d at 724. The Government must prove by a preponderance of the evidence that the challenged statements were voluntary. *Id.*

In *United States v. Chaidez*, 906 F.2d 377 (8th Cir. 1990), the Court described certain "suspects' characteristics" and "environmental" factors which may be considered in determining whether a person's consent to search was given voluntarily. In *United States v. Griffith*, 533 F.3d 979 (8th Cir. 2008), the Court adopted those factors in determining whether a suspect's post-arrest statement was given voluntarily. In determining whether his statement is voluntary, the Court may consider the following characteristics relating to the suspect:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id.* at 984 (citing *Chaidez*, 906 F.2d at 381).

The Court will consider the *Chaidez* factors as they apply here. Defendant is 32 years old. While he graduated from high school, he has limited intelligence. Defendant claims that he was intoxicated when responding to questioning, but the Court finds that there is no substantial evidence to support that argument. As described in detail above, Defendant was advised of his *Miranda* rights prior to responding to questions. Finally, Defendant has had substantial prior dealings with law enforcement. It is the Court's understanding that he had been arrested on numerous prior occasions. Accordingly, he was presumably "aware of the protections afforded to suspected criminals by the legal system."

In addition to the suspect's characteristics, the Court may also consider the following "environmental" factors:

> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id.* (citing *Chaidez*, 906 F.2d at 381).

Here, Defendant was questioned for only a short period of time. The audio recording extends for approximately 24 minutes, but the questioning did not begin until the fourth minute. That is, Defendant's questioning lasted only about 20 minutes. The officers did not raise their voices or otherwise strong-arm Defendant. Defendant concedes that "there was no physical coercion" by the police.[27] It is unclear to the Court what "promises" or "misrepresentations" Defendant claims were made by the police. The Court cannot find any promises made by Deputy Klunder when speaking with Defendant. Telling Defendant that he was "looking at a significant amount of time," was simply

---

[27] *Id.* at 1.

pointing out the obvious. *See United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) ("[T]elling the defendant in a noncoercive manner of the realistically expected penalties and encouraging him to tell the truth is no more than affording him the chance to make an informed decision with respect to his cooperation with the government."). While Klunder's statement that "today is going to be about your only opportunity to try and help yourself out" may have been something of an overstatement, the Court does not believe that it was sufficient to overcome Defendant's free will. Returning to the *Chaidez* factors, the Court concludes that no promises or misrepresentations were made at the time of questioning. It is undisputed that Defendant was "in custody" when questioned. The questioning occurred in the kitchen of Defendant's home.[28]

The factors set forth in *Chaidez* are not to be applied "mechanically," but rather serve as a "guide" to the Court's analysis. *Griffith*, 533 F.3d at 984. After considering all of the facts and circumstances, the Court concludes that the Government has met its burden of proving that Defendant's statements were given voluntarily. There is no evidence that Defendant's free will was overborne, or that his statement was extracted by threats or promises. Accordingly, I do not believe that Defendant is entitled to relief on this ground.

### VI. SUMMARY

In summary, the Court concludes that Defendant had the ability to understand his *Miranda* rights, and he voluntarily waived those rights. Defendant's waiver of his *Miranda* rights was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Vinton*, 631 F.3d at 483. I believe that Defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The Court further concludes that Defendant's post-*Miranda*

---

[28] The sixth environmental factor listed in *Chaidez*, which relates to the issue of whether a consent to search was given voluntarily, is inapplicable in determining whether a suspect's post-arrest statement was given voluntarily.

statements were made voluntarily and his will was not overborne. *LeBrun*, 363 F.3d at 724.

### *VII.  RECOMMENDATION*

For the reasons set forth above, I respectfully **RECOMMEND** that the Motion to Suppress Statements (docket number 19) filed by Defendant, as amended on November 3, 2011 (docket number 24), be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on November 9, 2011 and March 1, 2012.*

DATED this _7ᵗʰ_ day of March, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA